1  Law Offices of
   MATTHEW C. MICKELSON
2  MATTHEW C. MICKELSON, ESQUIRE, BAR NO. 203867
   16055 Ventura Boulevard
3  Suite 1230
   Encino, California 91436-2602
4  Tel:    (818) 382-3360
   Fax:    (818) 382-3364
5  E-mail: mattmickelson@bizla.rr.com
   Attorneys for Plaintiff, MILOS (1989) LTD.
6

7

8                  UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                     SAN JOSE DIVISION

11

12  MILOS (1989) LTD., an Israeli corporation, )   CASE NO. C08-02109 PVT
                                              )
13                                            )   DECLARATION OF MATTHEW
                                              )   C. MICKELSON IN SUPPORT OF
14                                            )   PLAINTIFF MILOS (1989) LTD.'S
                                              )   OPPOSITION TO DEFENDANT
15          Plaintiff,                         )   SUNOPTA GLOBAL ORGANIC
                                              )   INGREDIENTS, INC.'S PETITION TO
16  v.                                        )   COMPEL ARBITRATION AND MOTION
                                              )   FOR STAY PENDING ARBITRATION
17  SUNOPTA GLOBAL ORGANIC                    )
    INGREDIENTS, INC., a California           )
18  corporation,                             )
                                              )   DATE: July 1, 2008
19                                            )   TIME: 10 a.m.
            Defendant.                         )   DEPT:  5
20  _____)

21

22

23

24

25

26

27

28
    _____
                                    1
                  DECLARATION OF MATTHEW C. MICKELSON
                            C08-02109 PVT

1

2                          **DECLARATION OF MATTHEW C. MICKELSON**

3

4    I, MATTHEW C. MICKELSON, declare:

5              1.      I am an attorney at law, duly licensed to practice law before all of the

6    courts of the State of California.

7              2.      I represent Plaintiff Milos (1989) Ltd. ("Milos.")  As such, I have personal

8    knowledge of the facts stated below and could competently testify if called as a witness.

9              3.      On or about February 16, 2006, Milos and Defendant SunOpta Global

10   Organic Ingredients, Inc. ("OI") entered into a Packing/Processing & Marketing Agreement.  A

11   true and correct copy of the Agreement is attached hereto as Exhibit "A."

12             4.      On December 19, 2007, OI's attorney Steven H. Haney sent to Milos a

13   letter regarding arbitration.  A true and correct copy of the December 19, 2007 letter is attached

14   hereto as Exhibit "B."

15             5.      On February 8, 2008, Steven H. Haney sent to Milos a letter regarding

16   mediation.  A true and correct copy of the February 8, 2008 letter is attached hereto as Exhibit

17   "C."

18             6.      On February 19, 2008, I sent to Steven Haney a letter regarding mediation

19   of the Milos-OI dispute.  A true and correct copy of the February 19, 2008 letter is attached

20   hereto as Exhibit "D."  I received no response to this letter.  On February 27, 2008, I called Mr.

21   Haney and left him a message asking him to call me about the February 19, 2008 letter.  I

22   received no response to my message.

23             7.      On March 11, 2008, I sent to Joseph Stern, the president of SunOpta

24   Global Organic Ingredients, Inc., a letter demanding mediation.  A true and correct copy of the

25   letter is attached hereto as Exhibit "E."  The letter requested that OI contact me by March 21,

26   2008 to inform me if it intended to comply with the mediation demand.

27             8.      On March 18, 2008, I received a call from Jeffrey Bonelli, an attorney at

28

---

Mr. Haney's firm.  He did not discuss the mediation issue with me, but rather informed me that he would send me documents supporting OI's claims regarding its defenses to Milos's claims for damages within one week.  By March 25, 2008, no such documents were received, and accordingly I sent to Mr. Bonelli a letter on that date informing him of that fact.  A true and correct copy of the letter is attached hereto as Exhibit "F."

9.      On April 1, 2008, I received a letter from Mr. Haney providing two documents that allegedly support OI's claims for damages.  The letter does not discuss mediation or arbitration issues regarding Milos.  A true and correct copy of the letter is attached hereto as Exhibit "G."

10.     On April 2, 2008, I sent to Mr. Haney a letter regarding the documentation sent in support of OI's alleged damages.  The letter asserted that unless OI wired to Milos certain undisputed funds, Milos would file suit against OI.  A true and correct copy of the letter is attached as Exhibit "H."  I received a telephone message from Mr. Haney on April 11, 2008, stating that he was asking OI for more documents to support its contentions, but I never received any such documents.  The message did not make any mention of arbitration or mediation.

I declare under penalty of perjury under the laws of the United States of American and of the state of California that the foregoing is true and correct and would so testify if called as a witness.

Executed on June 9, 2008, at Encino, California.

_____
MATTHEW C. MICKELSON

DECLARATION OF MATTHEW C. MICKELSON
C08-02109 PVT

2.Jar, 2008 14:40    MILOS 1989 LTD                    No.0356   P. 2/6

# HANEY, BUCHANAN & PATTERSON L.L.P.

ATTORNEYS
707 WILSHIRE BOULEVARD
FIFTY-THIRD FLOOR
LOS ANGELES, CALIFORNIA 90017

TELEPHONE:  (213) 228-0500
TELECOPIER: (213) 228-0501

STEVEN H. HANEY

December 19, 2007

*Via U.S. Mail*

Jacob Cheskala                          IMAC
Prinir, Ltd.                            24955 Pacific Coast Hwy.
Industrial Center                       Suite C-302
M.P. Lower Galilee 15268                Malibu, CA 90265
Israel

Shlomo Ben David                        ACI
Jacob Cheskala                          3 Verulam Buildings
Milos                                   Gray's Inn
Western Galilee                         London WC1R-5NT
22821 Israel                            England

Re:   <u>Organic Ingredients v. Prinir, etc., et al.</u>

Gentlemen,

    Enclosed herewith are two demands for arbitration pertaining to two disputes arising out of certain products produced and packaged by Prinir/Milos at the request of my client, Organic Ingredients, Inc. We believe these disputes are related and overlap such that the claims, witnesses, documents and other evidence will be either the same or substantially similar.

    You may note from a review of the relevant arbitration clauses, there are two different venues involved. The Prinir contract provides for mediation and arbitration in Los Angeles, CA. The Milos contract provides for mediation and arbitration in London, England. While we are prepared to comply with the provisions of both contracts if necessary by conducting two arbitrations in two continents, we believe that a consolidated arbitration in one venue, preferably Los Angeles, would be much more cost efficient and allow the parties to address all disputes one time in one venue.

HANEY, BUCHANAN & PATTERSON L.L.P.

Please advise whether you will agree to conduct the mediation in Los Angeles pursuant to the two demands.

Very truly yours,

Steven H. Haney

SHH:fl
Enclosure

Milos

ATTACHMENT

Claimant alleges that Respondents and each of them breached a contract entered into in February, 2006, a copy of which is attached hereto. Respondents breached said contact by not allowing Claimant to obtain product from Milos as per the contract because Milos colluded with Prinir to allow Prinir to buy all the organic fresh tomatoes in the Israeli market some of which were to be purchased by Milos to fulfill the purchase order and obligations Milos had with Claimant. Due to Respondents' conduct, Claimant did not receive sufficient canned product as was called for in the contract causing Claimant to order product from Prinir (under duress) at a higher cost and lost profits. Claimant alleges that Milos did not comply with Claimants purchase order by not providing "nested cans" that Milos represented they could provide us as this was a requirement of Claimant's customer in the U.S. Claimant also alleges that Milos was in breach of contract for not having a HACCP plan in place at the time the product was produced, plus they delivered product which was defective. Product received in the U.S. was rejected by Claimant's customer and had to be cleaned up and repackaged at considerable expense to Claimant for which Claimant incurred damages. This customer canceled its future contracts with Claimant due to consistent quality problems associated with deliveries that arrived by both Milos and Prinir causing serious financial damages to Claimant as well as loss of reputation. Claimant allege that Jacob Cheskala, Milos and Prinir Ltd. Are the alter egos of one another at the time of these breaches and infractions, and that Cheskala owned, controlled and/or dominated the affairs of both Milos and Prinir Ltd., and that all are liable to Claimant. Claimant alleges that Cheskala, Prinir Ltd. and Milos conspired and colluded together to force Claimant to deal with Prinir Ltd., rather than other vendors.

Claimant asserts claims against Respondents for breach of contract, unfair competition and anti-trust violations, and prays for actual and consequential damages, lost profits and loss of business reputation, and alleges that the Respondents and each of them are guilty of malice and oppression allowing an award of punitive damages.



Fe Mar  2008  14:40     MiLOS 1988 LTD                          No.0356   P. 5/5

Prinir

ATTACHMENT

Claimant alleges that Respondents and each of them breached a contract entered into in June, 2004, a copy of which is attached hereto. Respondents breached said contract by delivering canned tomatoes that were damaged and/or destroyed which arrived either exploded or bloated. Additionally, cans were defective, rusted, stained and dirty, resulting in a product recall. In the most recent shipment, the cans were so filthy and/or damaged, they were rejected by the customer, causing Claimant to have to open every case and clean up the cans ( when possible), then repack them again, causing further damage. Prinir was also in breach of contract for not having a HACCP plan in place at the time the product was produced, plus they delivered product which was defective. Further, Prinir promised but subsequently failed to pay a credit of approximately $50,000.00-- instead of giving this credit, claimant was forced to pre-pay the next order without receiving any credit. Claimant also alleges that Jacob Cheskala, Prinir, Ltd., and another entity named Milos are the alter egos of each other at the time of these infractions and breaches, and that Cheskala owned, controlled and/or dominated the affairs of both Prinir Ltd and Milos, and that all are liable to Claimant. Claimant alleges that Cheskala, Prinir and Milos conspired and colluded together to force Claimant to deal with Prinir rather than other vendors.

Respondents also breached said contract by not allowing Claimant to obtain product from Milos as per the contract because Prinir either colluded with Milos or forced Milos not to buy the organic fresh tomatoes in the Israeli market which were to be purchased by Milos to fulfill the purchase order and obligations Milos had with Claimant. Prinir and Jacob Cheskala bragged that he was the owner of both companies and would not allow Milos to fulfill it's obligations to Claimant which supports our allegation of unfair trade and potential anti-trust violations. Due to Respondents' conduct, Claimant could not fulfill it's order with Milos (who was owned by Prinir at the time) and Claimant was forced to order product from Prinir (under duress) at a higher cost and lost profits and was forced to prepay for the order which was also in breach of the contract Claimant had with Respondent.

Claimant asserts claims against Respondents for breach of contract, unfair competition and anti-trust violations, and prays for actual and consequential damages, lost profits and loss of business reputation, and alleges that the Respondents and each of them are guilty of malice and oppression allowing an award of punitive damages.

## HANEY, BUCHANAN & PATTERSON L.L.P.
attorneys
707 WILSHIRE BOULEVARD
FIFTY-THIRD FLOOR
LOS ANGELES, CALIFORNIA 90017

telephone: (213) 228-6500
telecopier: (213) 228-6501

Steven H. Haney                     February 8, 2008

**Via U.S. Mail**

Jacob Cheskala                      IMAC
Prinir, Ltd.                        24955 Pacific Coast Hwy.
Industrial Center                   Suite C-302
M.P. Lower Galilee 15268 Israel     Malibu, CA 90265

Shlomo Ben David                    ACI
Jacob Cheskala                      3 Verulam Buildings
Milos                               Gray's Inn
Western Galilee 22821 Israel        London WC1R-5NT England

Re:  **Organic Ingredients v. Prinir, etc., et al.**

Dear Messrs. Cheskala and David:

Before we proceed to schedule the Arbitration in the referenced matter, we are required under our contracts to participate in a Mediation in an effort to determine whether it is possible to achieve a resolution of this dispute. Toward that end, I request that each of you contact me, either telephonically or via email, to advise whether you are willing to participate in a Mediation and, if so, to coordinate the scheduling of the Mediation that is required under the relevant contracts.

You may reach me by calling (213) 228-6505 or by sending me an email at shaney@hbplaw.com. I request that you contact me with a response to this letter, and that we complete the Mediation not later than 5:00 p.m. on Thursday, February 21, 2008. In the event I do not hear from you, I will assume that you intend to breach the provision in the contract which requires Mediation before Arbitration, and request that the Arbitrator make arrangements to schedule the Arbitration.

I look forward to your response.

Very truly yours,

Steven H. Haney

SHH:pp

*Law Offices of*

# Matthew C. Mickelson

TELEPHONE (818) 382-3360
FACSIMILE  (818) 382-3364

E-mail: mattmickelson@bizla.rr.com

16055 VENTURA BOULEVARD
Suite 1230
ENCINO, CALIFORNIA 91436

February 19, 2008

Steven H. Haney, Esq.
Haney, Buchanan & Patterson L.L.P.
707 Wilshire Blvd., 53rd Floor
Los Angeles, CA 90017

**VIA FACSIMILE & U.S. MAIL**

Re:    Milos (1989) Ltd. – Organic Ingredients Dispute

Dear Mr. Haney:

My client, Milos (1989) Ltd. ("Milos") has forwarded to me your letters of December 19, 2007 and February 8, 2008. Your February 8 letter demands mediation in accordance with the Packing/Processing & Marketing Agreement dated February 16, 2006 (the "Agreement") between Milos and Organic Ingredients, Inc. ("OI.")

As a preliminary matter, both of your letters have been addressed to "Jacob Cheskala" at Milos, and in addition both letters are addressed to both Milos and Prinir, Ltd. I have no information about the contractual relationship between Prinir and OI, but in any event Milos and Prinir are separate entities, and Prinir is not a party to the Agreement between Milos and OI. I do not represent Prinir; accordingly, please direct future correspondence regarding the OI-Milos dispute only to this office.

Frankly, my client has simply not been provided with any facts supporting the allegations made in the December 19 letter. As of today, OI (or its successor in interest) owes Milos $174,644.58, exclusive of interest, costs and attorneys fees, for product delivered to OI under the Agreement and not paid for. Each and every shipment sent to OI from Milos was first inspected and approved by OI representatives before shipment. The first indication from OI that there was a problem were e-mails asserting that, because of undisclosed defects with the product, OI would refuse to pay for the goods received. But Milos has never received any evidentiary material whatsoever in support of the assertions of these alleged product defects, nor has it ever been apprised whether any of the product received was acceptable for sale and/or sold to a third party. If product was damaged by a third party during transhipment from Israel to the United States, then there may exist a remedy for any damages suffered through insurance coverage. As of today, however, no facts about the alleged damages sufficient even to make an insurance claim have been submitted to Milos.

Steven H. Haney, Esq.
February 19, 2008
Page 2

As for the alleged alter ego relationship between Milos and Prinir, yet again no supporting facts have been set forth, other than the naked assertions in your December 19 letter. For your information, and your client's, the management of Milos and Prinir are completely separate; neither entity controls or influences the other; Milos and Prinir have never acted together in concert to harm OI or any other party; and any damages to OI caused by Prinir's alleged actions are the responsibility of Prinir alone, not Milos.

My client intends to abide by the Agreement, including its mediation and arbitration provisions, as it has done in the past. However, we believe that a mediation at this juncture would not be productive or beneficial to either side. We would prefer that at this stage both parties informally exchange the factual bases supporting their contentions. As of now, it does not appear that OI contests the amount or face value of the product shipped to it, but only alleges that the product was defective in some fashion once received; if this is not the case, please let me know and we will produce all purchase orders and invoices in this matter. Milos can also produce facts regarding the review and approval of the product by OI representatives prior to shipment from Israel. In return, OI should produce documentation showing the alleged deficiencies in the product when it was received in the United States, along with any facts supporting the alleged Milos-Prinir relationship.

Without this information, a mediation held right now would most likely be a waste of time and money, given that Milos has no information whatsoever to document any of the allegations made by OI in the December 19 letter. Milos simply cannot evaluate the charges raised by OI without any facts, and given the information known to it at the present time, there appears to be no basis for OI to withhold the money owed.

If the above proposal is amenable to your client, such a mutual exchange of facts could occur by the end of this month or by early March. At that point, it may be possible to determine if it this dispute can be resolved informally; if not, then we will proceed with the dispute resolution procedures required by the Agreement.

Steven H. Haney, Esq.
February 19, 2008
Page 3

     Please inform me by February 26, 2008 whether or not your client wishes to proceed in the manner discussed above.

          Very Truly Yours,

          LAW OFFICES OF
          MATTHEW C. MICKELSON

By _____
          MATTHEW C. MICKELSON

MCM: cn

## PACKING/ PROCESSING & MARKETING AGREEMENT

This Agreement (the "Agreement"), effective this 16 day of **Feb**, 2006, is by and between **Organic Ingredients, Inc.**, a California Corporation, with offices at 335 Spreckels Dr., Suite F, Aptos, CA 95003 ("OI"), and **Milos**, an Israeli private company, with offices at Western Galilee, Israel, (mobile post 22821) ("**Milos**").

### Recital

OI and Milos mutually desire that Milos produce, process, and pack for OI the organic food products described on **EXHIBIT "A"** attached hereto and incorporated herein by this reference (the "**Organic Products**"). OI desires to manage the sale of all Organic Products, to act as Milos' sole and exclusive marketing agent for the Organic Products within the United States and Canada, and to compensate Milos for its production, packing, and processing services within the agreed upon terms.

NOW, THEREFORE, in consideration of the foregoing Recital and other good and valuable consideration as set forth herein, OI and Milos do hereby agree as follows:

### AGREEMENT

1.  *Production, Processing, and Packing of Organic Products.*

    (a)  **Quantity and Schedule.** During the term of this Agreement, Milos shall purchase enough certified organic raw materials to produce, after July of each calendar year during the term of this Agreement (each a "**Crop Year**"), the quantity of Organic Products ordered by OI on or before December 10th of the previous Crop Year. By October 31st of each year Milos shall deliver to OI pricing on all the Organic Products for sale to OI for the upcoming season, which will be based on a written preliminary estimation made by OI of its annual quantity needs for the Organic Products for the next Crop Year (the "**Forecast**"). By no later than December 10th, of each year, OI shall submit a final written purchase order to Milos for all Organic Products being ordered by OI during the next Crop Year (an "**Annual PO**"), which will be for the exact quantities as in the Forecast for the same Crop Year. OI will have until January 31st, of each Crop Year the right to adjust its intended purchase quantities via written notice to Milos, but in no event shall such adjustments be more than a ten percent (15%) variation from the quantities specified in the Annual PO ~~~~~~~~~
    It is agreed that the quantity of Organic Products ordered by OI in each Crop Year will be at least 25% higher than the quantity in the previous Crop Year as long as Milo's pricing and quality remains competitive and as long as market conditions allow this growth rate

    (b)  **Price.** Prices for Milos' production, packing, and processing, including all costs relating to plates and labeling, of the Organic Products are CIF East and West Coast ports and are detailed in EXHIBIT "B" attached hereto. However, Milos shall also arrange for ground transportation and ensure delivery to OI's designated warehouses, the cost of

1

which shall be billed to OI and added to the applicable invoice.

(c)    **Invoicing and Payment Terms.**  OI will pay Milos a $50,000 prepayment towards inventory being purchased against the Annual PO one day after the signing of this Agreement and another $25,000 prepayment on March 31st, 2006.  OI will deduct $75,000 off the first set of invoices received from Milos..

At any time following OI's delivery to Milos of the Annual PO, OI shall obtain its then-current needed quantities of Organic Products by submission to Milos of purchase orders for Organic Products that will be withdrawn from the master Annual PO (the "**Periodic POs**").  Milos shall invoice OI for the Organic Products ordered via the Periodic POs.  Payments shall be made by OI to Milos within ten (10) days from the date such Organic Products clear US ports for delivery to OI, and OI shall receive an additional *two percent* (2%) discount off the invoice price for such Organic Products . Notwithstanding the other provisions of this Section 1(c), OI shall have paid Milos in full for those quantities of Organic Products reflected in the Annual PO *(as adjusted in OI's discretion pursuant to Section 1.(a) of this Agreement)* by no later than August 31 of the following Crop Year if any Organic Product still remains at Milos and has not yet been shipped. *For the purpose of this Section, "payment" by OI shall mean — wiring of money to Milos' bank account.*

(d)    **Miscellaneous.**  Milos hereby agrees that it will process and pack the Organic Products under a third-party private label. Milos hereby agrees that *it shall not, directly or indirectly,,* use the recipes used to produce the Organic Products in order to produce other products for the US market without the prior *express written* approval by OL. OI further agrees to manage the sale of all Organic Products. Milos hereby agrees that all Organic Products shall be processed and packed by Milos in accordance with the recipes/formulae developed by or for OI and provided to Milos from time to time (the "**Specifications**").

2.    *Samples*.  Milos shall submit, free of any charges to OI, such samples of the Organic Products as OI may reasonably require, so that OI may assure itself that the Organic Products are being packed and processed in accordance with the Specifications OI shall notify Milos within five (5) working days of receiving the samples for evaluation if, in OI's view, any Organic Product does not conform to its particular Specifications Should OI reject any Organic Product or samples thereof as not conforming to the Specifications, OI shall provide samples of the rejected Organic Product to Milos for its inspection.  If Milos disputes OI's judgment as to whether the particular Organic Product conforms to the Specifications, the matter in dispute shall be resolved by submitting a sample of such product for analysis to a mutually agreed upon independent third party certified laboratory.  The findings of such third party shall be final and binding on the parties, and the party whose opinion does not prevail shall bear the cost of the independent evaluation and report.

3.    *Non-Conforming Organic Product*.  If Milos fails to produce any Organic Product in accordance with its Specifications, and such non-conforming Organic Product is, in the view of OI, unmerchantable (but only if the independent laboratory mentioned in section

2

2 finds such **Organic Product to be non-conforming**), OI shall have no obligation to purchase such non-conforming Organic Product from Milos. In such case, Milos shall not deliver the non-conforming Organic Product to OI, if such non-conforming Organic Product has not already been delivered. OI shall make no payment to Milos therefor. If, in the view of OI, the non-conforming Organic Product is merchantable, OI and Milos shall agree, in good faith, upon the price at which OI shall purchase the non-conforming Organic Product from Milos.

4.    _Sole and Exclusive Agency_

Throughout the performance of this Agreement, Milos shall not sell any Organic Products to any other person or entity than OI for export to the United States and Canada . Therefore, Milos will refer all inquires it receives within the United States and Canada for Organic Products to OI and Milos will not solicit customers for Organic Products within the United States and Canada. Under no circumstances whatsoever shall Milos sell any products to OI's existing customers including those customers being solicited by OI for new sales.

Throughout the performance of this Agreement, OI shall not buy any Organic Products made from or based on tomatoes from any other person or entity other than Milos, except if Milos fails to supply OI Organic Products in the quality, quantity and in the specification ordered by OI and except for Prinir (where OI currently has a contract to buy organic retail products) and Tomatek (where OI buys industrial organic tomato products under contract.

*If OI can not sell all the industrial diced + paste for Milo's, then OI will notify Milos as to which customers OI has made offers to. And OI would allow Milos to offer product to non- OI customers through mutual agreement.*

5.    _Warranties_. Milos agrees, represents, and warrants to OI as follows:

(a)    Each Organic Product processed by Milos pursuant to this Agreement shall be processed in compliance with all applicable Israeli laws and regulations as well as applicable US state and federal laws and regulations, including, but not limited to: the California Organic Products Act of 2003 and regulations adopted pursuant thereto; the federal Organic Foods Production Act of 1990 and regulations adopted pursuant thereto; the federal Food, Drug and Cosmetics Act and regulations adopted pursuant thereto; including Juice Hazard Analysis and Critical Control Point (HACCP) regulations set forth in 21 CFR Part 120 and current Good Manufacturing Practices (CGMPs) set forth in 21 CFR Part 110.

(b)    Each Organic Product processed by Milos pursuant to this Agreement shall: (i) pass without objection in the trade and conform to Specifications; (ii) be fit for the ordinary purposes for which such Organic Products are used; (iii) run, within the variations permitted by this Agreement, of even kind, quality and quantity within each unit and among all units involved; (iv) be adequately contained, packaged and labeled as the Agreement requires; and (e) conform to the promises or affirmations of fact made on its container or label, if any.

3

(c)    Each Organic Product processed by Milos pursuant to this Agreement for export to the United States and Canada shall be processed in compliance with the laws and regulations of the United States and Canada , and shall be labeled by Milos as "Intended for Export" on the outside of the shipping package.    It shall be the responsibility of Milos to determine the applicable laws and regulations of the United States and Canada , and Milos hereby agrees, represents, and warrants that it shall undertake and discharge this responsibility.

6.    **_Indemnification._**  Milos agrees to indemnify and hold OI, its successors, assigns and customers harmless from all liability, loss, suits, damages, claims, demands and expenses, including attorneys' fees, incurred or sustained by OI, its successors, assigns or customers by reason of (a) the failure of the Organic Products to conform to the warranties in this Agreement, (b) injuries to persons or property caused by non-conformation of the Organic Products to the warranties in this Agreement or defects therein, (c) actual or alleged infringement of any rights of third parties by reason of the sale or use of the Organic Products, and (d) any breach of this Agreement by Milos.  Such indemnity shall be in addition to any other remedies provided by law, and shall survive acceptance of the Organic Products and payment therefore by OI. Further, Milos agrees to maintain a general liability insurance policy and an umbrella insurance policy with a loss limit of not less than two (2) million dollars per occurrence, and to name OI as an additional insured on such policy.

OI agrees to indemnify and hold Milos, its successors, assigns and customers harmless from all liability, loss, suits, damages, claims, demands and expenses, including attorneys' fees, incurred or sustained by OI, its successors, assigns or customers by reason of (a) the failure of the Organic Products to conform to OI's warranties in this Agreement, (b) injuries to persons or property caused directly by non-conformation of the Organic Products to OI's warranties in this Agreement, (c) actual or alleged infringement of any rights of third parties, including but not limited to infringement of any third party's intellectual  property rights relating to recipes or formulae developed by OI for the Organic Products and (iv) any breach of this Agreement by OI which directly causes injury to person or property. Such indemnity shall be in addition to any other remedies provided by law. Further, OI agrees to maintain a general liability insurance policy and an umbrella insurance policy with a loss limit of not less than two (2) million dollars per occurrence, and to name Milos as an additional insured on such policy.

7.    **_Disclaimer of Additional Warranties._**  MILOS AND OI HEREBY DISCLAIM ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE, AND ALL WARRANTIES THAT MIGHT OTHERWISE ARISE FROM ANY REPRESENTATIONS MADE BY OR ON BEHALF OF MILOS OR OI WITH RESPECT TO EACH ORGANIC PRODUCT. THIS DISCLAIMER INCLUDES ALL WARRANTIES THAT MIGHT OTHERWISE

4



ARISE FROM ANY DESCRIPTION OF ANY OF THE ORGANIC PRODUCTS OR THEIR QUALITY.

8.    *Risk of Loss.*  Milos shall bear the responsibility of any changes in product quality which occur during or after the Organic Product has left the Milos facility providing it has been handled and stored properly unless the cause of any such change in product quality is directly a result of the Specifications provided by OI.  Milos' obligation for any loss for which it is responsible under this Agreement shall be to reimburse OI for all direct losses suffered as a result of the rejected or recalled Organic Product.

9.    *Marketable Title.*  Milos warrants and agrees that OI shall have good and marketable title to the Organic Products, free and clear of liens, liabilities, encumbrances and charges made, done or suffered by Milos, except for liens arising in favor of Milos under application of law from any failure of OI to pay Milos any amounts that OI is obligated to pay to Milos hereunder.  OI agrees that Milos may file and record such liens as Milos deems necessary to protect its interest in payment for the Organic Products, and hereby irrevocably appoints Milos to be OI's true and lawful attorney in fact to execute, file, and record on OI's behalf, any documents required to be filed by OI to evidence Milos' interest in the Organic Products.  Milos shall provide copies of such documents to OI immediately upon filing with applicable agencies or authorities.

10.    *Confidential Information.*  As used in this agreement, the term "Confidential Information" means proprietary techniques and information that OI or Milos ("**The Disclosing Party**") has or will develop, compile, or own, which is disclosed to the other party ("**The Receiving Party**") pursuant to this Agreement.  Confidential Information includes information disclosed by The Disclosing Party (including its employees, agents, and independent contractors) or its customers to The Receiving Party during the term of this Agreement, but also information (including inventions or formulas) developed by Milos for OI's benefit.  Confidential Information is to be broadly defined and includes (a) all information that has or could have commercial value or other utility in the business in which The Disclosing Party or its customers are engaged or in which they contemplate engaging; and (b) all information that, if disclosed without authorization, could be detrimental to the interest of The Disclosing Party or its customers, whether or not such information is identified as Confidential Information.  By example and without limitation, Confidential Information includes all information on The Disclosing Party's products, product specifications, product formulations, pricing strategies, customers, customer contacts, customer requirements, growers, grower contacts, grower capabilities and limitations, processes, formulas, trade secrets, inventions, discoveries, improvements, research or development test results, specifications, data, know-how, formats, marketing plans, business plans, strategies, forecasts, unpublished financial information, budgets, proposals, projections, and customer and supplier agreements, including the terms of this Agreement.  Confidential Information does not include (i) any information that at the time of disclosure or thereafter is generally available to and known by the public (other than as a result of an unauthorized disclosure by either party), (ii) is developed by The Receiving

5

Party without reliance on the Confidential Information, or (iii) is or was available to The Receiving Party on a non-confidential basis from a source other than The Disclosing Party who, insofar as is known to The Receiving Party after reasonable inquiry, is not prohibited from transmitting the information to The Receiving Party by contractual, legal or fiduciary obligation to The Disclosing Party.

11.     *Nondisclosure of Confidential Information.*     The Receiving Party promises and agrees that neither it nor any of its directors, officers, employees, agents, assigns, or affiliates shall use (other than for the purpose of this Agreement) or disclose to any other person or entity, directly or indirectly, either during or after termination of this Agreement, any Confidential Information unless specifically authorized in writing by The Disclosing Party.     If The Disclosing Party gives The Receiving Party written authorization to make any disclosures, The Receiving Party shall do so only within the limits and to the extent of that authorization.     The Receiving Party acknowledges that the unauthorized use or disclosure of Confidential Information may be highly prejudicial to the interests of The Disclosing Party or its customers, an invasion of privacy, or an improper disclosure of trade secrets.     The Receiving Party further acknowledges that such unauthorized use or disclosure of Confidential Information constitutes unfair competition with The Disclosing Party.     The Receiving Party agrees that it shall take every reasonable precaution to protect the confidentiality of Confidential Information, including, without limiting the generality of the foregoing, all steps taken by The Receiving Party to maintain the confidentiality of its own confidential information.     Upon termination of this Agreement, there shall be no further use by The Receiving Party of any Confidential Information.     The Receiving Party shall return all such Confidential Information in its custody, control or possession, and all information in its custody, control or possession based on, derived from, or utilizing Confidential Information, to The Disclosing Party within thirty (30) days of the termination of this Agreement.     Both parties specifically agree that     The Receiving Party's obligations to protect and return Confidential Information shall survive termination of this Agreement, and that the provisions of this Section 11 may be enforced through specific performance and/or injunctive relief in any court having jurisdiction as long as the confidential information is confidential.

12.     *Third Party Information.*     Milos and OI represent and warrant that this Agreement does not result in the breach of any agreements with or duties to any third party.     Milos and OI will not disclose to each other or use on the other party's behalf any confidential information or other intellectual property belonging to others, and will indemnify and hold harmless the other party from and against any claims arising out of or relating to any allegation that Milos or IO (as the case may be) has used or disclosed the confidential information or intellectual property of another, and/or that the other party has in any way interfered with an economic relationship or prospective economic relationship involving Milos or IO and a third party.

13.     *Nonsolicitation.*     Milos agrees that, in order to protect OI's Confidential Information and to prevent any unfair competition, Milos shall not, during the term of this agreement and for a period of eighteen (18) months thereafter, directly or indirectly solicit

6

or attempt to solicit any business of selling organic products from any OI customers, including (but not limited to) those customers set forth on in EXHIBIT "C" attached hereto and incorporated herein by this reference. Milos further agrees that, in order to protect OI's Confidential Information and to prevent any unfair competition, Milos shall not, during the term of this agreement and for a period of eighteen (18) months thereafter, sell, produce, deliver or distribute, or offer to sell, produce, deliver or distribute any organic ingredient or Organic Products to any OI customer without OI's express written authorization. OI and Milos specifically agree that Milos' obligations in this Section 13 shall survive termination of this Agreement, and that the provisions of this Section 13 may be enforced through specific performance and/or injunctive relief in any court having jurisdiction.

14.    *Additional Products and/or Services.*   Any additional product or other related services performed hereunder by Milos for OI, and not specifically provided for herein, shall be requested in writing by OI from time to time and shall be charged at such rates and paid upon such terms as shall be agreed upon in writing by OI and Milos.

15.    *Books and Records.*   Milos shall maintain accurate and complete records such as may be required with respect to all aspects of its production and movement of Organic Products hereunder and shall make the same available for inspection and copying by OI upon reasonable notice, during regular business hours. Without limiting the generality of the foregoing, Milos shall maintain all records required by any law or regulation, including the organic and kosher certification requirements. Milos shall comply with all organic and kosher certification audit requirements.

16.    *Status as Independent Contractors.*   With respect to performance under this Agreement, the parties acknowledge that their relationship is that of independent contractors. Neither party shall have the right to bind the other in relationships with third parties. Nothing herein shall be construed or interpreted to create a joint venture or any other relationship between the parties.

17.    *Term and Termination.*   The initial term of this Agreement shall be three (3) years from the date hereof. Notwithstanding the following provisions of this Section 17, subsequent to the first anniversary of this Agreement, either party may terminate this Agreement upon one hundred eighty (180) days prior written notice to the other. In the absence of such notice, this agreement will automatically renew for additional 3 year terms. This Agreement may also be terminated by either party in the event of a breach of the terms hereof. The non-breaching party shall provide the party who has breached this Agreement with written notice of such breach immediately upon the discovery of such breach by the non-breaching party, and said notice shall specify the nature and extent of such breach. Upon receipt of such notice, the breaching party shall have thirty (30) days to cure the breach. If the breach referred to in the notice is not cured within such thirty-(30-) day period, this Agreement shall terminate upon the expiration of such period. In the event of termination of this Agreement, OI shall be entitled to take possession, an

7

Milos's expense, of any Organic Products in Milos's possession, all of which Milos shall warehouse solely for the benefit of OI.

18.   *Force Majeure*.  Neither party to this Agreement shall be responsible or liable in any way for any default in the performance hereof arising directly or indirectly from causes beyond the control of such party, including but not limited to fire, flood, war, embargo, strike, boycott, labor difficulty, accident, explosion, riot, insurrection, shortage of fuel, mechanical breakdown, acts of God, expropriation of plant by government authority, crop shortages, or for any failure of performance of any kind caused in any way by federal, state or other governmental authority.

19.   *No Waiver*.  The provisions of this Agreement may not be waived, altered, amended or repealed, in whole or in part, except with the written consent of both parties to this Agreement. The failure or omission by either party to insist upon or enforce any of the terms of this Agreement shall not be deemed a waiver of such terms unless the waiver is in writing and signed by the party against whom such waiver is sought to be enforced. Waiver of one term is not a waiver of any other term. Waiver of any term on any one occasion is not a waiver of the same term on any other occasion.

20.   *Assignment*.  Neither party to this Agreement may assign this Agreement or delegate any of its duties or obligations or assign any of its rights hereunder. This Agreement shall be binding on, and shall inure to the benefit of, the parties to it and their respective permitted successors and assigns.

21.   *Severability*.  It is intended that each section of this Agreement shall be viewed as separate and divisible, and in the event that any section (or subpart thereof) shall be held to be invalid, the remaining sections shall continue to be in full force and effect.

22.   *Attorneys Fees*.  If either party to this agreement undertakes litigation or arbitration against the other party arising out of or in connection with this agreement, the successful or prevailing party or parties will be entitled to recover from the other party, as an element of his costs of suit, and not as damages, reasonable attorney's fees, arbitration costs, and court costs incurred.

23.   *Mediation Required*.

In the event of a dispute, claim or difference arising out of or in connection with this contract, the parties agree to first enter into non-binding Mediation through the International Mediation and Arbitration Center (IMAC) located at its offices in London, England under its Mediation Rules current at the date the dispute is referred to Mediation. The Mediation will take place in London, England.  If the parties resolve the dispute, claim or difference at Mediation or thereafter by written settlement agreement, in the event of a breach of the settlement agreement, it can be entered as a Judgment in any court of competent jurisdiction, without regard to any conflicts of law, in any country in the world including but not limited to the United States and Israel.  The costs of the Mediation shall be borne by the parties equally.

8

31 Oct. 2007 16:44    MILOS 1989 LTD                No.5997  P. 22/23

24.  *Arbitration.*  If any dispute, claim or difference between the parties is not resolved by Mediation through IMAC, it shall be determined through neutral binding arbitration in England under IMAC.  The parties will select one Arbitrator from the IMAC panel.  The Application for a judicial order of attachment, receivership, injunction or other provisional remedy shall not constitute a waiver of the right to arbitrate under this provision.  Any Order, Decision or Award by the appointed Arbitrator can (without regard to any conflicts of law), in the event of non-compliance, be entered as a Judgment in any court of competent jurisdiction in any country of the world including but not limited to the United States of America and Israel.

25.  *Applicable Law.*  This Agreement shall be governed by and interpreted in accordance with the laws of the United States.

26.  *Venue.*  Any litigation arising out of Sections 23 and 24 of this Agreement or a Judicial Review of the Arbitration proceeding or an Application for a provisional remedy as provided in Section 24 of this Agreement or any Application to enforce the parties right to mediate or arbitrate under this Agreement shall take place in the appropriate court of the United States of America.

27.  *Notice.*  All notices, requests, consents, demands, and other communications required or given under this Agreement shall be in writing and shall be deemed to have been duly given:  (1) on the date of service if served personally on the party to whom notice is given, or if sent by telecopies (with a copy also mailed to such party), in either case with written confirmation of receipt;  or (2) within Seventy-Two (72) hours after mailing, if mailed to the party to whom notice is to be given by (i) first class mail, registered or certified or Express Mail, postage prepaid, or (ii) Federal Express, DHL, World-Wide Courier Express, or other recognized courier service, charges prepaid, and in either case, properly addressed to the party at the address set forth below or any other address that any party may designate by notice to the other.

| If to OI: | If to Milos: |
|---|---|
| Attn.: Joseph J. Stern, President Organic Ingredients, Inc. 335 Spreckels Dr., Suite F. Aptos, CA 95003 | Attn: Milos XXx Address |

IN WITNESS WHEREOF, the parties have caused their corporate names to be affixed hereto as of the dates set forth below:

"OI":

9

31.Oct. 2007 16:44    MILOS 1989 LTD                    No.5997   P. 23/23

Organic Ingredients, Inc., a California Corporation

By: _Joseph J. Stern, Pres._

JOSEPH J. STERN, President

Dated: February _16_, 2006

"MILOS":

Milos XXX

By: _____    SHLOMO BEN-DAVID.

Dated: February _16_, 2006

10

*Law Offices of*
# Matthew C. Mickelson

TELEPHONE (818) 382-3360
FACSIMILE   (818) 382-3364

E-mail: mattmickelson@bizla.rr.com

16055 VENTURA BOULEVARD
Suite 1230
ENCINO, CALIFORNIA 91436

March 11, 2008

Attn.: Joseph J. Stern, President.                    <u>**VIA FEDERAL EXPRESS**</u>
SunOpta Global Organic Ingredients Inc.
335 Spreckels Drive, Suite F
Aptos, CA 95003

      Re:   <u>Milos (1989) Ltd. -- SunOpta Global Organic Ingredients Dispute</u>

Dear Mr. Stern:

    This letter serves as a demand for mediation under paragraph 23 of the February 16, 2006 Packing/Processing & Marketing Agreement between Milos (1989) Ltd. and SunOpta Global Organic Ingredients Inc. (hereinafter referred to as "OI" [OI was previously known as Organic Ingredients, Inc.]) Mediation is required to be conducted in London England with A Commercial Initiative for Dispute Resolution ("ACI.")

    This letter also serves under paragraph 17 of the aforementioned Agreement as a formal notice of breach for OI's failure to pay Milos $174,644.58 due and payable under the Agreement.

    It is my understanding that OI's attorney, Steven Hancy, has previously issued a demand for mediation in this case. Milos never rejected that demand, although in a letter of February 19, 2008 to Mr. Haney, I suggested alternative negotiation procedures that could have possibly resolved this matter without the need to proceed to mediation. I never received a response to that letter. Accordingly, Milos is now demanding mediation in accordance with the Agreement,

Mr. Joseph Stern
March 11, 2008
Page 2

       The Agreement provides that both parties shall pay the costs of mediation equally. Please contact me by March 21, 2008 to inform me if and when OI intends to comply with this mediation demand. We can then coordinate dates for the mediation and arrange for payment of the mediation. If I receive no response by that date, then Milos will have no alternative but to proceed with the arbitration provisions of the Agreement, given OI's failure to cooperate in advancing and paying for the mediation process.

       Very Truly Yours,

       LAW OFFICES OF
       MATTHEW C. MICKELSON

       By _____
          MATTHEW C. MICKELSON

MCM: cn
cc: Steven H. Haney (via U.S. Mail)

*Law Offices of*
# Matthew C. Mickelson

TELEPHONE (818) 382-3360
FACSIMILE   (818) 382-3364

E-mail: mattmickelson@bizla.rr.com

16055 VENTURA BOULEVARD
Suite 1230
ENCINO, CALIFORNIA 91436

March 25, 2008

William Jeffrey Bonelli, Esq.
Haney, Buchanan & Patterson L.L.P.
707 Wilshire Blvd., 53rd Floor
Los Angeles, CA 90017

**VIA FACSIMILE & U.S. MAIL**

Re:  <u>Milos (1989) Ltd. – SunOpta Global Organic Ingredients Dispute</u>

Dear Mr. Bonelli:

As you know, we spoke last Tuesday, March 18, 2008.  You informed me that your client, SunOpta Global Organic Ingredients ("OI"), had documents pertaining to the payment dispute with Milos, and that you would provide that documentation to me within a week.  You informed me that this documentation would provide a basis for OI's failure to pay Milos the sums due under the contract between the parties.

As of today I have received no documents from you.  Please be advised that my client is unwilling to countenance any further delay in this matter.  Since OI has failed to respond to Milos's demand for mediation, Milos has the right at any time to commence a lawsuit against OI for the full amount due.  Milos will not stand around waiting for negotiations that may or may not happen.  If OI wishes to continue with informal negotiation, as you indicated it wishes to, then it must shows its good faith by doing the following:

- OI must provide complete information as to why it refuses to pay for the product Milos shipped to it, including dates of shipments, full information about the product received and why it is allegedly defective, efforts to mitigate damages, information about sales of product made by OI, etc.

- Any sums that are not in dispute, i.e. for product received by OI that is not alleged to be defective, must be paid immediately to Milos.

William Jeffrey Bonelli, Esq.
March 25, 2008
Page 2

    If OI fails to provide this information and wire the required sums to Milos by April 1, 2008, Milos will immediately file suit against OI for its breach of contract.

                   Very Truly Yours,

                   LAW OFFICES OF
                   MATTHEW C. MICKELSON

                   By _____
                       MATTHEW C. MICKELSON

MCM: cn

HANEY, BUCHANAN & PATTERSON L.L.P.
attorneys
707 WILSHIRE BOULEVARD
FIFTY-THIRD FLOOR
LOS ANGELES, CALIFORNIA 90017

telephone: (213) 228-6500
telecopier: (213) 228-6501

Steven H. Haney

April 1, 2008

*Via Facsimile* **818-382-3364** *and U.S. Mail*

Matthew C. Mickelson
16055 Ventura Blvd.
Suite 1230
Encino, CA 91436

Re:   **Organic Ingredients v. Prenir, etc., et al.**

Dear Mr. Mickelson:

Pursuant to our efforts to informally resolve this dispute, I enclose a document entitled "Estimated Financial Impact Due to Prinir/Milos Quality Issues". As you can see, we presently calculate that damages attributable to Prinir's conduct are $395,976.79, and that the damages attributable to Milos' conduct are $255,762.07. In furtherance of our attempts to discuss and resolve this dispute, I request that you provide us with a specification of the damages claimed by Milos in this case.

Additionally, we have not yet heard from Prinir in response to our demand for arbitration. Please advise whether you intend to represent Prinir in this case as well. If you are not going to represent Prinir in this case, please let us know if you have any information as to whether they intend to comply with the contract by arbitrating and, if so, who their counsel will be. If you are completely unaware of whether Prinir intends to defend the case, please let us know that so we can begin the process of taking their default and converting that into an enforceable judgment against them.

I look forward to discussing the case with you after you have sent us a specification of the Milos' damages.

Very truly yours,

Steven H. Haney

SHH/db
Enclosure

# Estimated Financial Impact Due to Prinir/Milos Quality Issues

| | | | | | Split | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | Prinir | Milos |

### Out of Pocket payments to customers for Prinir/Milos quality Issues

| | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Daymon | 8/31/06 | 1,926 cases damaged cans | 19,067.40 | 1.00 | 19,067.40 | - |
| Daymon | 10/31/06 | 2781 cs. of dumped/rusty cans | 27,531.90 | 1.00 | 27,531.90 | - |
| Daymon | 7/20/07 | Payments to Daymon for bad product | 282,468.65 | 1.00 | 282,468.65 | - |
| UNFI - Hershey | 2/28/07 | 708 Cases chunky (leaky cans, expired date code) | 6,220.80 | 1.00 | 6,220.80 | - |
| UNFI - Hershey | | 96 cases diced (rusty cans) | 902.40 | 1.00 | 902.40 | - |
| UNFI - Hershey | 3/23/07 | Inspection and repacking | 13,260.50 | 1.00 | 13,260.50 | - |
| Hershey | 4/20/07 | Invoice #598045 - Tomato rework | 1,150.00 | 1.00 | 1,150.00 | - |

### Out of pocket expenses for staff to deal with Prinir/Milos quality issues

| | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Jim Piccolo | 8/14/06 | Expenses for trip to NJ | 2,250.53 | 1.00 | 2,250.53 | - |
| Jim Piccolo | | Jim Piccolo lost work time in NJ - Four days @ $300/day | 1,600.00 | 1.00 | 1,600.00 | - |
| Jim Piccolo | 10/13/06 | Expenses for trip to NJ (hotel, taxi) | 697.02 | 1.00 | 697.02 | - |
| Jim Piccolo | | Jim Piccolo lost work time in NJ - Four days @ $300/day | 1,600.00 | 1.00 | 1,600.00 | - |
| Jim Piccolo | 3/18/07 | Jim Piccolo's hotel in Israel | 1,617.44 | 0.50 | 808.72 | 808.72 |
| Jim Piccolo | 3/29/07 | Jim Piccolo's airfare to Israel | 1,391.73 | 0.50 | 695.87 | 695.87 |
| Jim Piccolo | 3/31/07 | Jim Piccolo lost work time in Israel - Five days @ $300/day | 1,500.00 | 0.50 | 750.00 | 750.00 |
| Jim Piccolo | 4/28/07 | Jim Piccolo's hotel in Israel | 1,638.01 | 0.00 | - | 1,638.01 |
| Jim Piccolo | 4/30/07 | Jim Piccolo lost work time in Israel - 11 days @ $300/day | 3,300.00 | 0.00 | - | 3,300.00 |
| Jim Piccolo | 8/6/08 | Jim Piccolo expenses trip to Newark/MCS | 1,158.13 | 0.50 | 579.07 | 579.07 |
| Jim Piccolo | 8/6/08 | Jim Piccolo lost work time in Israel - Three days @ $300/day | 900.00 | 0.50 | 450.00 | 450.00 |
| Ron Deering | 3/19/07 | Expenses for trip to Israel | 3,042.78 | 0.50 | 1,521.39 | 1,521.39 |
| Moshe Rogovski | 7/20/07 | Hired to inspect Plant/Production cycles | 5,250.00 | 0.50 | 2,625.00 | 2,625.00 |
| Jordan Smith | 12/31/07 | Visit E. Coast warehouse with Jacob | 1,490.88 | 1.00 | 1,490.88 | - |

### Out of pocket expenses to third parties to identify/sort/clean/store damaged Prinir/Milos product

| | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Fedex Trade | 4/12/06 | Storage for product on FDA hold | 735.00 | 1.00 | 735.00 | - |
| Halls Warehouse | 9/1/06 | Labor chgs. to sort/wrap | 3,724.20 | 1.00 | 3,724.20 | - |
| Halls Warehouse | 10/31/06 | Dumpster chgs/whse. Labor/stretchwrap | 5,240.20 | 1.00 | 5,240.20 | - |
| MCS | 1/30/07 | Invoice #13411-QA labor for inspection | 175.00 | 0.50 | 87.50 | 87.50 |
| MCS | 1/26/07 | Invoice #2963-WHS Handling and storage | 190.00 | 0.50 | 95.00 | 95.00 |
| MCS | 1/26/07 | Invoice #2964-WHS Handling and storage | 190.00 | 0.50 | 95.00 | 95.00 |
| MCS | 1/26/07 | Invoice #2962-WHS Handling and storage | 190.00 | 0.50 | 95.00 | 95.00 |
| MCS | 1/26/07 | Invoice #2936-WHS Handling, storage, and damages | 875.59 | 0.50 | 437.80 | 437.80 |
| MCS | 1/26/07 | Invoice #2935-WHS Handling, storage, and damages | 731.93 | 0.50 | 365.97 | 365.97 |
| Halls Warehouse | 2/28/07 | Labor chgs. to sort/wrap | 1,983.00 | 0.50 | 991.50 | 991.50 |
| Fedex | 11/9/06 | Samples from Halls sent to Prinir | 113.25 | 1.00 | 113.25 | - |
| The ARC | various | The ARC: cleaning and resorting | 21,892.69 | 0.57 | 12,478.83 | 9,413.86 |
| ATRONA | 3/1/07 | Material testing labs | 1,200.00 | 1.00 | 1,200.00 | - |

### Lost margin/damages to future Sales & Other Expenses

| | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Prinir | Q1 2007 | Containers shipped Frozen | 32,124.98 | 1.00 | 32,124.98 | - |
| Daymon | 12/31/06 | Margin loss on sales to Daymon | 32,463.30 | 1.00 | 32,463.30 | - |
| Daymon | | Daymon Ahold Sales for 1 year; 10% margin | 43,338.24 | 0.50 | 21,669.12 | 21,669.12 |
| UNFI | | UNFI Sales for 3 years; net 7% margin | 107,082.57 | 0.50 | 53,541.28 | 53,541.28 |
| UNFI | 3/25/08 | ArkII product claims and returns | 156,602.00 | 0.00 | - | 156,602.00 |

| | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Subtotal of OI expenses | 786,890.12 | | 531,128.05 | 255,762.07 |

| | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| OI sales of Damaged/Distressed product to discounters (as of February 29, 2008) | | | (135,151.26) | 1.00 | (135,151.26) | - |

| | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Net loss by OI | 651,738.86 | | 395,976.79 | 255,762.07 |

## Milos Summary
### 31-Dec-07

**Milos Billings**

| Invoice Number | Invoice Value | (Short) Over Shipments | Adjusted Invoice Value |
|---|---|---|---|
| 60090 | 20,240.00 | - | 20,240.00 |
| 60159 | 20,240.00 | - | 20,240.00 |
| 60180 | 31,621.44 | (160.00) | 31,461.44 |
| 60183 | 70,400.01 | (208.90) | 70,191.11 |
| 70010 | 10,604.41 | (44.41) | 10,560.00 |
| 70042 | 21,008.64 | - | 21,008.64 |
| 70097 | 16,698.88 | 371.56 | 17,070.44 |
| 70098 | 43,449.60 | (4,963.20) | 38,486.40 |
| 70099 | 16,329.60 | - | 16,329.60 |
| 70157 | 38,592.00 | - | 38,592.00 |
| 70158 | 37,616.00 | - | 37,616.00 |
| | 321,459.33 | (5,004.95) | 316,454.38 |
| Milos Credit 001C/06 | (1,012.00) | - | (1,012.00) |
| credit approved by Judith at Milos | | | |
| OI invoice IN10546 to Milos | (2,898.56) | - | (2,898.56) |
| | (1,430.69) | - | (1,430.69) |

**Organic Ingredients Payments**

| | Date | Amount |
|---|---|---|
| Advance Payment | 28-Mar-06 | 75,000.00 |
| January 4th wire for invoice 60183 | 4-Jan-07 | 70,400.01 |
| January 15th wire for invoice 70010 | 15-Jan-07 | 10,560.00 |
| May 21st wire for 70042, less deductions | 23-May-07 | 15,298.49 |
| | | 171,258.50 |

| Arithmetic Balance Due | | 145,195.88 |
|---|---|---|

*Law Offices of*

# Matthew C. Mickelson

TELEPHONE (818) 382-3360
FACSIMILE  (818) 382-3364

E-mail: mattmickelson@bizla.rr.com

16055 VENTURA BOULEVARD
Suite 1230
ENCINO, CALIFORNIA 91436

April 2, 2008

Steven H. Haney, Esq.
Haney, Buchanan & Patterson L.L.P.
707 Wilshire Blvd., 53rd Floor
Los Angeles, CA 90017

**VIA FACSIMILE & U.S. MAIL**
**PRIVILEGED SETTLEMENT**
**DISCUSSIONS**

Re:    <u>Milos (1989) Ltd. – Organic Ingredients Dispute</u>

Dear Mr. Haney:

I have reviewed your letter of April 1, 2008 with my client.  As a preliminary matter, please be informed that I do not represent Prinir and have had no contact with them.  I have no idea how they plan to respond to your demand for arbitration.

First, I will discuss the matters in which the parties appear to be in agreement.

There appears to be no dispute regarding the face values of invoices 70097 ($16,698.88), 70098 ($43,449.60), 70099 ($16,329.60), 70157 ($38,592) and 70158 ($37,616.)  Both parties agree that all of these invoices are unpaid.  With regard to invoice 70042, Milos shows a balance left to be paid of $1,799.  It is Milos's position that all of the unpaid invoices, and the amount due on invoice 70042, are currently due and payable.[1]  These invoices together total $154,485.08.  In addition, Milos canned and packaged product under the agreement between the parties which was never shipped due to OI's failure to pay the amounts due above.  The value of that product is $20,159.50; Milos also contends that payment for this shipment is due and payable as well.  These numbers put together make up Milos's claim of $174,644.58 against OI.

Accordingly, the significant dispute here does not appear to concern the numerical values on the invoices provided by Milos to OI; with the possible exception of a disagreement over OI's liability for the final unshipped product valued at $20,159.50.

---

[1]Milos has not been given a reason for the deductions listed in the "(Short) Over Shipments" column, and disputes them; in any event, this issue is small potatoes compared to the much larger dispute between the parties, described below.

Steven H. Haney, Esq.
April 2, 2008
Page 2

Now, on to the issues in which the parties are not in agreement.

OI has provided a sheet entitled "Estimated Financial Impact Due to Prinir/Milos Quality Issues." We note that in the section labeled "Out of Pocket Payments to Customers for Prinir/Milos Quality Issues," there are no "quality" problems listed for Milos at all. In other words, in the very section where OI is supposed to note the alleged problems with Milos's product, no problems whatsoever are listed.

This makes untenable the other charges against Milos listed in the sections labeled "Out of Pocket Expenses for Staff to Deal with Prinir/Milos Quality Issues" and "Out of Pocket Expenses to Third Parties to Identify/Sort/Clean/Store Damaged Prinir/Milos Product." If OI cannot list any alleged problems with Milos shipments, then it cannot hold Milos accountable for charges it undertook to fix Prinir's defective merchandise.

Finally, the "Lost Margin/Damages to Future Sales and Other Expenses" section is a welter of speculation and completely unfounded charges. First, Milos is being charged with lost Daymon sales. But none of the Milos product was labeled or designed for Daymon; accordingly, the alleged future losses for one year from loss of Daymon sales cannot be attributed to Milos. As for the supposed $53,541.28 in damages from lost UNFI sales for three years, this is a wholly speculative number which, yet again, is based on nothing, since OI has failed to identify any defective product packaged by Milos which was rejected by UNFI. Finally, the gigantic amount of $156,602 in "Add'l product claims and returns" attributed to UNFI is suspect in the extreme. This number again seems to have been picked from midair, with no support behind it, and was supposedly calculated only a few weeks ago, more than a year after all product was received by OI. Where is this supposed returned product? Is it in the possession of OI, and will OI be able to show that it is defective? My client is profoundly skeptical, given the fact that every shipment was approved by OI representatives before it was sent to the U.S.

The documents provided by OI yet again show its unsupported belief that Milos and Prinir are somehow the same company and/or involved in some sort of conspiracy, such as to impute Prinir's alleged bad conduct to Milos. As I have reiterated previously, Milos and Prinir are entirely separate companies. OI cannot ascribe any damages it suffered due to Prinir's conduct to Milos. And yet OI's latest documents continue to attempt to do so.

My client is not willing to undergo another interminable wait to receive documents from OI that show its alleged damages. After weeks of back and forth, the most OI has been able to show are two small summary charts, none of which show that any Milos product was defective at all. Accordingly, Milos is not willing to negotiate any further over this matter unless OI shows a good faith desire to resolve this dispute informally. Unless OI wires to Milos the $145,195.88 that OI admits is arithmetically due to be paid in its "Milos Summary," we will commence a

Steven H. Haney, Esq.
April 2, 2008
Page 2

lawsuit against OI.  Please let me know whether your client will wire that money by April 9, 2008 at the latest.

Very Truly Yours,

LAW OFFICES OF
MATTHEW C. MICKELSON

By _____

MATTHEW C. MICKELSON

MCM: cn